Ricardo TORRES, Sr., Plaintiff,

v.

Larry G. MASSANARI, Acting
Commissioner of Social
Security, Defendant.

No. 01–CV–1322(NGG).

United States District Court,
E.D. New York.

May 16, 2002.

Herbert S. Forsmith, New York City, for plaintiff.

Carolyn Lisa Miller, U.S. Attorney's Office, Civil Division, Brooklyn, NY, for defendant.

*MEMORANDUM AND ORDER*

GARAUFIS, District Judge.

Plaintiff Ricardo Torres, Sr. ("Plaintiff"), appeals the Commissioner of Social Security's ("Commissioner's") final decision that his disability, resulting from 1993 gun shot wounds to his left leg, ceased on April 1, 1998 and that he is no longer entitled to disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.* The Commissioner has moved for judgment on the pleadings pursuant to FED. R.CIV.P. 12(c). Plaintiff has opposed this motion and cross-moved for judgment on the pleadings seeking an order directing the Commissioner to award benefits to the Plaintiff. For the reasons discussed below, the Commissioner's motion is denied and the Plaintiff's cross-motion is granted.

I. **Procedural History** [1]

Plaintiff filed an application for disability insurance benefits on March 5, 1993, claim-

---

**1.** Plaintiff, in his Memorandum of Law, incorporates fully and without modification the procedural history as stated in Defendant's Memorandum of Law. (Pl.'s Mem. of Law in Opp'n to The Commissioner's Mot. for Judg- ment on the Pleadings and in Support of the Pl.'s Cross–Mot. for Judgment on the Pleadings at 1.) Accordingly, this opinion adopts

ing disability caused by gunshot wounds to his left thigh. The application was denied initially and upon reconsideration. Following a hearing and decision dated September 6, 1994, Administrative Law Judge ("ALJ") Mark Hecht determined that Plaintiff was disabled as of January 31, 1993, due to a gunshot wound in his left thigh and post-surgical complications. (Mem. of Law in Support of the Commissioner's Mot. for Judgment on the Pleadings at 1.) Plaintiff began receiving disability insurance benefits. (*Id.* at 2.)

The Social Security Administration ("SSA") conducted a review of Plaintiff's medical condition in 1998 and found that he was no longer receiving medical treatment. (*Id.*) Plaintiff failed to appear for a consultative examination scheduled as part of the review. Based on these circumstances, the SSA determined that Plaintiff's disability had ceased as of April 1998. Plaintiff requested a reconsideration. On reconsideration the SSA considered additional medical evidence. However, it affirmed the determination that Plaintiff's disability had ceased. A disability hearing officer also affirmed this decision. (*Id.*)

Upon Plaintiff's request, he was granted a hearing before an ALJ, which took place before ALJ Roy Liberman on August 25, 1999. ALJ Liberman considered Plaintiff's case *de novo* and found that Plaintiff's disability had ceased on April 1, 1998, because his impairment had improved and he had the ability to perform the full range of sedentary work. (*Id.*) Plaintiff requested a review of this determination on May 8, 2000, which was denied by the Appeals Council on January 24, 2001. (*Id.* at 2–3; Tr. i; 5–7.) Plaintiff timely commenced this action on March 5, 2001, seeking review of the Commissioner's final decision.

the undisputed procedural history as stated in

## II. Discussion

### A. Standard of Review

■ The role of a district court in reviewing the Commissioner's final decision is limited. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000); *see also* 42 U.S.C. § 405(g). " 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir.2000) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501) (internal quotations omitted). If substantial evidence supports the ALJ's findings, the decision is binding, *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.1984), and this Court cannot "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (internal quotations and citations omitted). However, in deciding whether the Commissioner's conclusions are supported by substantial evidence, the reviewing court must "first satisfy [itself] that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purpose of the Act.' " *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir.1982) (quoting *Gold v. Sec'y of HEW*, 463 F.2d 38, 43 (2d Cir.1972)).

### B. Establishing a Disability under the Social Security Act

"To receive federal disability benefits, an applicant must be 'disabled' within the

the Defendant's Memorandum of Law.

meaning of the Act." *Shaw*, 221 F.3d at 131; *see also* 42 U.S.C. § 423(a), (d). A claimant is "disabled" within the meaning of the Act when he can show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment … which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

■ Both the Commissioner and the courts of the Second Circuit use the same five-step regulatory analysis to determine whether a claimant has "disabled" status under the Act. *See Shaw*, 221 F.3d at 132 (citing the five steps with approval); *Curry*, 209 F.3d at 122 (same). First, the claimant must not currently be engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must show a "severe impairment" which significantly limits his mental or physical ability to do basic work activities. *Id.* § 404.1520(c). Third, the claimant must establish either that the impairment is listed in Appendix 1 of the regulations or that the impairment is equivalent to a listed impairment. *Id.* § 404.1520(d). Fourth, if the impairment is neither listed in the Appendix nor the equivalent of an impairment listed in the Appendix, the claimant must show that he has no residual functional capacity to perform his past work. *Id.* § 404.1520(e). Fifth, if the claimant is unable to perform his past work, the Commissioner must determine if there is other work in the national economy which the claimant could perform. *Id.* § 404.1520(f). The claimant has the burden of proving the first four steps, if he succeeds, then the Commissioner bears the burden of

proof on the last step. *See Shaw*, 221 F.3d at 132.

■ In making the required determinations, the Commissioner must consider (1) the objective medical facts, (2) the medical opinions of the examining or treating physicians, (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others, and (4) the claimant's educational background, age, and work experience. *See Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir.1983). Further, the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits. *See* 20 C.F.R. § 404.900(b) (1999) (expressly providing that the SSA "conduct the administrative review process in an informal, nonadversary manner"); *Sims v. Apfel*, 530 U.S. 103, 110–11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *Shaw*, 221 F.3d at 134. Moreover, "[w]here, as here, the claimant is unrepresented by counsel, the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Echevarria*, 685 F.2d at 755 (quoting *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980)) (internal quotations omitted).

## C.  Medical and Other Evidence Contained in The Administrative Record

### 1.  Plaintiff's Original Disability and Medical History: 1993–98

Plaintiff sustained multiple gunshot wounds to his left leg in January 1993. On February 1, 1993, he underwent surgery on his left leg that involved the insertion of a metal rod and screws to stabilize fractured bone in his leg. (Tr. 62–74.) After he was discharged on February 6, 1993, the wound became infected and the Plaintiff had to return to the hospital for addi-

tional care. (Tr. 72–77, 91.) After this treatment, Plaintiff was further monitored with regular examinations and x-rays until October 5, 1993. (Tr. 75–76, 82–92.) A consultative examination on June 1, 1993, by Dr. Seo, stated that Plaintiff was still using crutches, that he had difficulty with toe-heel walking, he was only able to squat ¼ of the way, and his muscle strength in the left leg was grade ⅘ compared with⅘ in his left leg. (Tr. 77–78.) Based on this exam, Dr. Seo concluded that "[f]unctionally, patient may need a crutch or cane at present. Weight-bearing on the left leg is probably difficult. He may be able to sit for 6 hours and stand for less than 2 hours in an 8–hour workday. He may be able to carry less than 10 lbs." (Tr. 78.)

Based on the above medical history, ALJ Hecht concluded that:

"The medical reports from Kings County Hospital and the findings of consultative examiner Dr. K. Seo are consistent with residual functional capacity for less than a full range of sedentary work.... It was noted at [sic] weight bearing on the left leg was difficult and that the claimant could not stand or walk for two hours nor could he carry ten pounds. Inasmuch as medical evidence shows an inability to perform lifting and carrying and walking and standing necessary to perform a full range of sedentary work, it is determined that the occupational base is markedly eroded thus the claimant is unable to make a vocational adjustment to any work existing in significant numbers in the national economy."

(Tr. 100.)

After he began receiving SS benefits, Plaintiff did not seek any further medical treatment until May 29, 1998, when he went to the Yale New Haven Hospital. (Tr. 181–90.) The medical record from Yale New Haven Hospital states that Plaintiff complained of left-sided back pain triggered by walking up the stairs the day before. (Tr. 183.) Although the doctor's notes state that Plaintiff denied difficulty ambulating, they also indicate that his gait was halting and favored use of his right leg. (*Id.*) The report further indicates that Plaintiff reported that the pain triggered was so severe that he "couldn't walk." (Tr. 184.) Plaintiff was diagnosed as having thoracic strain, was instructed to take Motrin 600mg every four to six hours for pain and was given general instructions on preventing, and caring for back pain. (Tr. 186, 192.)

## 2. SSA's 1998 Review of Plaintiff's Disability

Pursuant to the SSA's review of Plaintiff's disability status, on July 20, 1998, Plaintiff was examined at SSA's request by Dr. Joseph Ayoub. (Tr. 138–40.) After reviewing Plaintiff's medical, family and social history and conducting a physical examination, Dr. Ayoub reached the following assessment: "There is evidence of decreased range of motion in the lumbar spine, hips, and left knee, also decreased motor power in the left lower extremity. He has difficulty in his gait and he definitely needs a cane for ambulation." (Tr. 140.) Dr. Ayoub made no assessment with respect to Plaintiff's ability to work or perform various exertional activities.

On January 11, 1999, again at SSA's request, Plaintiff was examined by Dr. Steven Eisen. (Tr. 141.) Dr. Eisen's examination was consistent with Dr. Ayoub's examination, finding that: "Upper extremities are normal to strength. Lower extremities shows weakness in the left lower extremity as well as diminution of length compared to the right. There is a decreased girth to both the thigh and the calf. The patient has roughly ⅘ motor strength to ⅘ motor strength in the left lower extremity." (*Id.*) In addition, Dr. Eisen stated, "[i]t would appear to me that

patient would have difficulty doing some gainful employment due to the use of a cane as well as his statements that his leg gives way. I believe that a cane is necessary for ambulation although he can walk without it. There is fear that his leg will gave [sic] way. He, however, certainly has the strength to maintain his balance and posture. I will have difficulty quantifying his pain and certainly it would seem that he could be retrained to do some gainful employment in a nonambulatory fashion." (*Id.*)

### 3. Plaintiff's 1999 ALJ Hearing and Disability Determination

By letter dated August 9, 1999, Plaintiff was notified that he would have an ALJ Hearing on August 25, 1999, less than twenty days away. (Tr. 196–97.) While this notice contained a "Waiver of Twenty Day Written Notice of Hearing," the waiver was not signed by Plaintiff. (Tr. 201.) Plaintiff nonetheless appeared on the date of the hearing, but without legal counsel or a representative. The ALJ advised Plaintiff that he had the right to "[h]ave a lawyer or ... somebody else represent you." (Tr. 208.) After a discussion that was held off the record, the ALJ stated, "[a]ll right, Mr. Torres has indicated off the record that he wants to continue with the hearing, is that correct?" To which Mr. Torres responded, "Yes." (Tr. 209). The hearing proceeded that same day.

Plaintiff testified, in response to the ALJ's questions, that he had finished eleventh grade but never graduated high school. (Tr. 214–15.) Prior to the gunshot wound to his leg, he had always worked in jobs that required heavy lifting. (Tr. 217–18.) Plaintiff testified that he had not worked since he had been shot in the leg while working as a UPS driver, and that since April of 1998, when his disability benefits were discontinued, he continued to suffer disabling pain in his left leg. (Tr. 219.) Plaintiff testified that "I get pains in my leg and then it grabs my back" and that he still used his cane. (Tr. 219–20.) Plaintiff also explained that the doctors had told him he needed another operation on his leg but warned it might result in paralysis, therefore, Plaintiff had decided he did not want to risk surgery. (Tr. 220.) Finally, when asked about any recent treatment, Plaintiff explained he had not gotten medical care for a couple of years because he did not have Medicare. When he began receiving Medicare, he went to Yale New Haven Hospital one time after suffering pain in his leg and back that prevented him from moving. (Tr. 222–23.)

With respect to his ability to perform daily activities, the Plaintiff testified that he had trouble going up and down stairs. He, therefore, avoided his apartment stairs when possible and went down them slowly when it was necessary to go out. (Tr. 214.) Plaintiff testified that when his girlfriend, Jenny Ortiz, drove him between Connecticut and New York, he would need to stop and get out of the car to walk. Plaintiff testified he could lift "maybe ten, fifteen pounds," that he did not play sports or drive a car and that he needed help getting dressed, specifically to put on his shoes. (Tr. 224.) Plaintiff testified that he could walk about half a block before getting tired and that it was difficult to sit in a chair because he could not sit straight, but had to sit sideways in the chair. Also, Plaintiff said he could not sleep on his left side or on his back, but could only sleep on his right side. (Tr. 225.) Plaintiff's wife, who he still lived with at the time of the hearing, took care of the apartment while he passed the time by watching television or playing cards. Jenny Ortiz, Plaintiff's girlfriend and the mother of his son, also testified. She confirmed that everything Plaintiff had said was accurate and that she observed his difficulty walking and playing with his son because of the pain in his leg and back. (Tr. 229.)

Dr. Sage D. Sikand, an orthopedic surgeon, testified as a medical advisor after having reviewed the Plaintiff's file and having heard the testimony of Plaintiff and Ms. Ortiz. Dr. Sikand mostly summarized the medical record in Plaintiff's file, with much of his testimony marked on the transcript as "inaudible."[2] (Tr. 230–232.) Dr. Sikand testified that in his opinion Plaintiff should have no problem bending, could probably lift thirty pounds occasionally, could sit and stand continuously for six hours with several breaks of ten to fifteen minutes and walk for about a half hour at a time. (Tr. 232–35.)

The ALJ then concluded the hearing stating that he would have an orthopedist examine Plaintiff in order to provide a more recent medical evaluation. (Tr. 236.) This post-hearing evaluation was provided by Dr. O'Brien, who mainly reported on the existing medical history and description of physical pains and limitations as stated by Plaintiff. Dr. O'Brien did conduct a physical examination and found that Plaintiff, "walks with an antalgic gait.[3] He walks with his knee in a locked position. He can heel and toe walk without difficulty, but does suffer from some stability problems of his knee . . . There is some leg length shortening and some shrinking on the left side. His back motion is noted to be 20 degrees out of 25 bilaterally for lateral flexion. He can forward flex to approximately $30/60$ and extend to $15/25$." Dr. O'Brien also reported that "[s]tanding and walking are affected by his impairment. He said he can walk one city block before he has to sit down. He can sit for one-half hour and then gets up and sits down again. He can climb stairs and balance occasionally. He can kneel and crawl occasionally, but he should not be stooping or crouching. There is no problem with reaching, bending, feeling, pushing, pulling, seeing, hearing or speaking." (Tr. 204.) It is not clear, however, to what extent these conclusions are a reiteration of Plaintiff's own description of his limitations or to what extent Dr. O'Brien was affirming or making these assessments himself.

There was no testimony by a vocational expert, or any evidence offered as to the types, or availability of jobs a person with Plaintiff's limitations could perform.

Based on the above medical evidence and testimony, the ALJ concluded that Plaintiff was no longer disabled. Specifically, the ALJ relied on Dr. Sikand's opinion that Plaintiff could "stand, walk or sit for 6 hours out of an 8 hour day, as long as he was allowed appropriate breaks." The ALJ also noted that while Dr. O'Brien failed to provide an opinion on Plaintiff's residual functional capacity, he "did not present any evidence that would contradict Dr. Sikand's findings." (Tr. 14.) Finally, the ALJ stated, without elaboration, that "[t]he claimant's allegations of more significant limitations are not supported by the medical evidence." (Id.) In sum, the ALJ found that Plaintiff's medical impairment had improved since September 6, 1994, that this improvement was related to his ability to work and that he could perform the full range of sedentary work, but that he still had a severe impairment and was unable to perform any of his past relevant work. (Tr. 15–16.) Based on these findings, the ALJ applied Medical Vocational

---

**2.** There is also one page of Dr. Sikand's testimony, page 234, missing from the transcript of the Administrative Record supplied to this court.

**3.** "An antalgic gait is a 'pain relieving gait.' The patient spends less time on the affected limb. . . . The arm opposite the affected side is sometimes thrown out laterally to help maintain balance." See "MeDNet" Figure 142, located at www.echo.uqam.ca/mednet/angl ais/ hermes__a/hip/part__2.html# Answer__08 __01 (last visited May 16, 2002).

Rule 201.24 and found that it directed a finding of not disabled. (*Id.*)

## D. Review of the ALJ's Determination

Plaintiff, who is represented by counsel on this appeal, argues that he was not given a full and fair hearing because the SSA and ALJ failed to give adequate notice of his right to legal representation and the ALJ failed to fulfill his heightened duty to assist the *pro se* claimant in developing the record. Further, the Plaintiff argues that the ALJ's determination that Plaintiff was not disabled was not made in accordance with the law and regulations and is not supported by substantial evidence.

### 1. Notice of the Right to Legal Representation

The record, as discussed above, reveals that Plaintiff was given less than twenty days notice of his hearing date, and then appeared without an attorney. Because the discussion of his desire to proceed with, or without an attorney was off the record, it is difficult for this court to determine whether his decision to proceed *pro se* was knowing and intelligent. Certainly, this record does not demonstrate the heightened notice standard that has been required by some courts in this district and other circuits. *See Frank v. Chater,* 924 F.Supp. 416, 423–24, 426 (E.D.N.Y. 1996) (discussing notification standards in Fifth, Seventh, and Eleventh Circuits and requiring pre-hearing notification to contain, at least, explanation of the benefits of attorney representation, the possibility of seeking free counsel, and information regarding the statutory twenty-five percent withholding limitation on attorney's fees in SS cases and the fee approval process); *see also Ruggiero v. Callahan,* 97 CV 1051, 1998 WL 938737, at *3 (E.D.N.Y. Nov.24, 1998) (citing with approval *Frank* and finding notice inadequate). Because I find, as discussed below, that the ALJ failed to carry out his enhanced duty to ensure a full and fair hearing for this *pro se* plaintiff and because I find that the finding of non-disability is not supported by substantial evidence, this case does not turn on the adequacy of notice to Plaintiff. Accordingly, I do not reach the issue of whether the notice was statutorily adequate.

### 2. The ALJ's Affirmative Duty to Develop the Record

■ Because Plaintiff proceeded with his hearing *pro se,* the ALJ had a special duty "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Echevarria,* 685 F.2d at 755 (internal quotations omitted). The transcript of Plaintiff's hearing demonstrates that the ALJ did not ensure a full and fair hearing for Plaintiff. For instance, when the Plaintiff gave a legitimate explanation for his decision not to get another operation (his fear of paralysis), the ALJ responded by saying, "So you want to spend the rest of your life with the pain that you have?", and did not inquire further about the potential risks and benefits of surgery, or what Plaintiff could, or could not do to improve the use of his leg. (Tr. 220.) Further, the ALJ's questioning of Ms. Ortiz, who corroborated Plaintiff's testimony regarding his pain and physical limitations, was extremely cursory. (Tr. 228–29.)

More problematic, however, is the fact that the ALJ completely failed to assist the Plaintiff in questioning Dr. Sikand who, without having ever examined Plaintiff, testified that Plaintiff could bend and do work that involved six hours of sitting and standing. Instead, when Dr. Sikand's testimony was complete, the ALJ effectively eliminated any meaningful response by the Plaintiff with the following exchange:

ALJ: All right, Mr. Torres, do you have any questions of the Doctor, what he just said?

CLMT: Yes, the bending I can't hardly bend—

ALJ: Well, yeah, yeah, all right—

CLMT:—the sitting for six hours—

ALJ:—in other words you want to make a statement?

CLMT: Siting for six hours is difficult. (Tr. 235.) Thereafter, there was no further questioning of Dr. Sikand by Plaintiff or the ALJ, nor any further opportunity for Plaintiff to respond to Dr. Sikand's testimony. Instead, the ALJ asked Plaintiff what could be done about the difference in length between his two legs, to which Plaintiff stated "the only thing is the operation." (Tr. 236.) In light of Plaintiff's lack of representation, and the fact that he had not obtained or presented any medical or vocational experts of his own, it was incumbent on the ALJ to *at least* help the Plaintiff to respond to the opinions of the state medical expert. *See Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975) (finding that ALJ failed in his duties to claimant by not informing *pro se* claimant of the benefit of, and opportunity to produce expert testimony on her own behalf).

Ultimately, the ALJ did obtain an additional medical evaluation in an attempt to supplement the record. But that opinion, as the ALJ himself noted, failed to provide any concrete information as to Plaintiff's residual functional capacity or vocational options. (Tr. 14, 204.) The only other evidence materially relied upon by the ALJ in his opinion was the medical opinion of two state paid doctors who had performed consultative exams prior to the hearing. Neither of these opinions, however, made an assessment of the residual functional capacity of Plaintiff. These gaps in the medical record combined with the ALJ's failure to assist the Plaintiff in

eliciting testimony from his own witness and cross-examining the Commissioner's medical expert resulted in less than a fair hearing for Plaintiff.

### 3. Lack of Substantial Evidence in Support of the ALJ's Determination

■ Because the ALJ found that Plaintiff established the first four elements of proving a disability and was unable to perform his past relevant work, (Tr. 16), the Commissioner carried the burden of proving that there was other work in the national economy which the claimant could perform. Although the ALJ concluded that the Plaintiff could perform the full range of sedentary work and thus resorted to administrative notice to satisfy the Commissioner's burden at this final step, I do not find substantial evidence in the record to support this conclusion.

The ALJ's decision relied primarily on Dr. Sikand's opinion as evidence that Plaintiff could perform those activities required by sedentary work. Dr. Sikand, however, never examined Plaintiff, and none of the doctors who did actually examine Plaintiff reported that he would be able to perform the full range of sitting, standing, walking and other activities required in a sedentary job. *See Carroll*, 705 F.2d at 643 (remanding because Commissioner introduced no vocational evidence and because "[t]hree of the four doctors who examined Carroll ... were never asked what work or activity such as sedentary employment, Carroll *could* perform and hence expressed no opinion on that subject"); *Williams v. Bowen*, 87 Civ 0909, 1989 WL 1307, at *6 (S.D.N.Y. Jan.5, 1989) (finding no substantial grounds for concluding plaintiff could perform sedentary work where the "record does not reveal a scintilla of evidence that plaintiff is capable of sitting for six of eight hours").

Further, Dr. Sikand's opinion and familiarity with Plaintiff's medical history is questionable in light of his contradictory statements about how long the Plaintiff could sit or stand for any given amount of time. Dr. Sikand first opined that Plaintiff had physical limitations such as being able to lift "maybe thirty pounds occasionally" but that he could stand, sit and walk for six hours in an eight hour day with about three or four breaks of ten to fifteen minutes rest. (Tr. 232–33.) Later in his testimony, Dr. Sikand acknowledged that Plaintiff did "have some weakness and the shrapnel wounds did, did go up to the back of the knee and the knee is liable to give out once in awhile." (Tr. 235.) Thus, he amended his opinion, stating, "I just stated that he could walk for six hours. That should be limited to maybe half an hour to forty five minutes at a time." (Tr. 235.) Dr. Sikand, however, reiterated his opinion that Plaintiff could sit or stand for six hours continuously and that he should have no problem bending. (Tr. 235.)

Despite the inconsistencies in Dr. Sikand's own testimony, and the lack of direct support in the record for Dr. Sikand's conclusions that Plaintiff could lift up to thirty pounds or sit and stand continuously for six hours, the ALJ gave this opinion considerable weight. In so doing, he summarily concluded that the "claimant's allegations of more significant limitations are not supported by the medical evidence." (Tr. 14.) In crediting Dr. Sikand's opinion and discrediting Plaintiff's contrary testimony, the ALJ also seems to have disregarded those portions of Dr. Ayoub's and Dr. Eisen's physical evaluations which supported Plaintiff's subjective complaints. Both Dr. Ayoub and Dr. Eisen concluded that Plaintiff had difficulty walking, required a cane for steady ambulation and had decreased range of motion in his left leg. Dr. O'Brien's examination was also consistent with these medical findings. And, the Yale New Haven Hospital doctor diagnosed Plaintiff with thoracic strain and instructed him to take Motrin daily. None of these medical examinations undermine the credibility of Plaintiff's testimony, in fact they tend to support Plaintiff's claims of disabling pain and difficulty with both walking and continuous standing or sitting. In light of this evidence and the ALJ's failure to provide any specific reasons for discrediting Plaintiff's subjective complaints, let alone reasons with "sufficient specificity to permit intelligible plenary review of the record," *Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988), I find that the ALJ gave undue weight to Dr. Sikand's advisory opinion regarding Plaintiff's residual functional capacity.

■ Further compounding the insufficiency of the evidence in this case is the lack of testimony or opinion from a vocational expert. While a vocational expert is not always necessary to establish the existence of gainful jobs in the national economy which a claimant could perform, reliance on administrative notice has been found inappropriate where "there was no 'job description clarifying the nature' and requirements of such jobs, ... and no showing whatever that [the claimant] would have been able to perform such jobs." *Parker v. Harris,* 626 F.2d 225, 233–34 (2d Cir.1980) (internal citation omitted). Plaintiff, in this case, had always worked at jobs requiring heavy, manual labor. It is undisputed that he can no longer perform such jobs. He has never completed high school and there was no showing that he has skills other than those used for manual jobs. There was no evidence or opinions from doctors or vocational experts as to what types of sedentary jobs Plaintiff could perform with his given physical limitations. Accordingly, I find that reliance on administrative notice was inappropriate in this case.

As a final matter, I note that in comparing the 1993 medical examination of Dr. Seo, upon which a finding of disability was based, with the 1998 examinations by Dr. Ayoub and Dr. Eisen, there remains a striking similarity in the description of Plaintiff's condition. Each of these examinations concluded that Plaintiff needed a cane to assist in walking, that he had decreased strength in his left leg and that he had difficulty with his gait and weight bearing on his left leg. (Tr. 77–78, 139–41.) While Dr. Seo had affirmatively concluded that Plaintiff could only stand for less than 2 hours in an 8 hour day and could carry less than 10 pounds, neither Dr. Ayoub or Eisen affirmatively indicated that Plaintiff had improved beyond these limitations. And although Dr. Eisen noted that Plaintiff's bone fracture had healed and speculated that "it would seem" Plaintiff could be retrained to do some gainful employment, he offered no assessment of what types of jobs Plaintiff could perform with his given physical limitations, or to what extent his condition prohibited other types of jobs. These records may indicate some level of general improvement, however, they are not adequate to support a conclusion that Plaintiff's disability has so improved that he is now able to perform the full range of sedentary work.

### III. Conclusion

In sum, given Plaintiff's *pro se* status, and the ALJ's failure to adequately develop the record, especially during the hearing, I find that Plaintiff was not afforded a full and fair hearing. Moreover, I find that the Commissioner failed to carry its burden of presenting sufficient medical and vocational evidence to establish that Plaintiff has the ability to perform alternative work that exists in the national economy. "Because the Commissioner failed to introduce evidence sufficient to sustain his burden on the fifth step ... remand for the sole purpose of calculating an award of benefits is mandated." *Curry v. Apfel,* 209 F.3d 117, 124 (2d Cir.2000); *see also Carroll,* 705 F.2d at 643, (2d Cir.1983) (remanding for calculation of benefits).

Accordingly, for all of the reasons discussed herein, it is hereby ORDERED that the Commissioner's motion for judgment on the pleadings is DENIED and that Plaintiff's crossmotion for judgment on the pleadings is GRANTED. It is further ORDERED that the decision of the ALJ is reversed and this case is remanded to the Commissioner solely for the calculation of Plaintiff's disability benefits.