**Sharon SNYDER, Plaintiff,**

v.

**Jo Anne B. BARNHART,[1]**

---

1. Plaintiff's complaint names former Commissioner of Social Security Kenneth Apfel. Jo

**Commissioner of Social Security,**
**Defendant.**

No. 00–CV–6332L.

United States District Court,
W.D. New York.

July 25, 2002.

Anne B. Barnhart, the current Commissioner, is automatically substituted as defendant pursuant to Fed.R.Civ.P. 25(d)(1).

Catherine M. Callery, Public Interest Law of Rochester, Rochester, NY, for Plaintiff.

Brian M. McCarthy, Asst. U.S. Atty., U.S. Attorney, Rochester, NY, for Defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) in appeal of the final decision of the Commissioner of Social Security ("the Commissioner") that plaintiff was not disabled under the Social Security Act ("the Act"), and therefore, was not entitled to disability benefits. Both the plaintiff and the Commissioner have moved for judgment on the pleadings pursuant to Fed.R. of Civ.Pro. 12(c). For the reasons set forth below, the plaintiff's motion is granted in part and the Commissioner's motion is denied.

### PROCEDURAL BACKGROUND

Plaintiff, Sharon Snyder ("Snyder"), applied for Supplemental Security Income disability benefits on June 3, 1996. (T.

183–85). Plaintiff claimed that she was unable to work due to severe back pain and carpal tunnel syndrome. (T. 12). The Social Security Administration denied the application initially and on reconsideration. (T. 171–76). Following a hearing, the Administrative Law Judge ("ALJ") held that Snyder was capable of performing "medium" work, but not capable of performing her past work as a maid. Before issuing his decision, the ALJ sent interrogatories regarding a Spinoscope[2] test relied on by plaintiff's treating physician to both the New York State Office of Disability Determinations and plaintiff's treating physician, Dr. Richard Dobson. (T. 306–08). However, the ALJ did not wait for Dr. Dobson's answers to these questions prior to issuing his decision. In his decision dated February 24, 1998, the ALJ found that Snyder was ineligible to receive disability benefits. (T. 11–20). The Appeals Council affirmed the ALJ's decision on May 26, 2000. (T. 4–6). The instant action to review the Commissioner's final decision followed.

### FACTUAL BACKGROUND

Plaintiff was born on September 8, 1957 and graduated from high school in 1977. (T. 12, 42, 54). Her only job was as a maid for a cleaning service, where she worked from March 1990 until May 1992 (T. 93). She suffered a back injury while working and visited Rochester General Hospital emergency room on November 6, 1991. (T. 125–129). There she was diagnosed with muscular back pain and given Motrin to help alleviate the pain. *Id.* On November 12, 1991, she returned to the emergency room where she complained of continued back pain. (T. 130–33). She was diagnosed with acute back strain and told to refrain from work for two to three weeks. (T. 133). This diagnosis was confirmed by Snyder's then physician, Dr. Herbert W. Schmugler, on the same day.

Snyder returned to work on December 9, 1991; however, she was unable to perform her duties without severe pain. Thus, Dr. Schmugler declared her disabled for a few more weeks and suggested physical therapy. (T. 143–48). On February 10, 1992, Snyder again returned to work only to find that she could not perform her job requirements due to severe back pain. Dr. Schmugler reported on March 23, 1992, that she could no longer continue her present occupation. (T. 140). He reexamined Snyder on December 13, 1993, and concluded that she was possibly suffering from recurrent back problems. (T. 214).

Snyder saw two additional doctors in connection with her workers' compensation claim: Dr. Franklin V. Peale on March 27, 1992, and Dr. Robert Wilson on July 27, 1992 and December 7, 1993. Dr. Peale restricted Snyder's lifting to fifteen pounds with brief periods of bending. (T. 149–52). He found her to have mechanical low back strain. During his first visit with Snyder, Dr. Wilson also limited her lifting to fifteen pounds and suggested that she avoid repetitive bending. *Id.* He declared her to suffer from low back sprain that was related to her work activities. (T. 225–27). However, in December 1993, he indicated that she had recovered from the back injury even though she continued to complain of pain. (T. 219).

Approximately two years later, on December 19, 1995, Snyder began her treat-

---

**2.** The Spinoscope is commercially available mechanical testing equipment that takes a functional snapshot of a patient for a period of fifteen to twenty minutes through dynamic electromyographic ("EMG") measurements. (T. 335–41, 389–94). These dynamic EMG measurements, which are taken while the patient is engaged in some type of physical activity, such as gate cycling, are often correlated with recorded muscle activity to reveal the patient's motion and overall function. *Id.*

ment with Dr. Richard Dobson. (T. 239–40). His initial clinical findings were that she was suffering from disc injury at L5–S1 and further testing was needed. He gave her a prescription for Ultram to ease her back pain. *Id.* Snyder saw Dr. Dobson again on January 30, 1996, complaining of severe back pain. (T. 237). It was at this time that he declared her incapable of working in any capacity. (T. 237–38). He noted a "slight posterior displacement of the nuclear material in the T12–L1 discs [which] may in fact be causing abnormal mechanical stress...." (T. 237). Dr. Dobson further referred to the medical journal, *Spine,* as having associated the aforementioned phenomenon with chronic back pain. (T. 328–34, 237).

Snyder continued to see Dr. Dobson throughout 1996. (T. 233–88). During this time, Dr. Dobson noted her complaints of back pain. Additionally, he noted her complaints of "shaking" down her spine and tingling of her hands. *Id.* On January 29, 1996, Snyder underwent Spinoscope testing. (T. 285). The testing revealed average functioning of eighty-five percent.[3] *Id.* The test further noted that Snyder possessed overall good function, however, the computer noted inconsistent behavior. *Id.* "[T]orsional injury below L3/L4 [and] bilateral reluctance to move away from the vertical" was also suggested. *Id.* Moreover, on July 26, 1996, Dr. Dobson observed that Snyder had a sudden muscle spasm as she was raising her body from a chair. *Id.* He associated this with paraspinal muscle spasm. *Id.*

On July 29, 1996, Snyder underwent a second Spinoscope test. The testing revealed average functioning of ninety-two percent. (T. 276). The test further noted a "serious lack of cooperation [and advised the reader to] use extreme caution in accepting any detected pathology." *Id.* Dr. Dobson crossed out the words "serious

lack of cooperation" and added "variability in unfolding lordosis." *Id.* Additionally, the test detected that Snyder had a "significant restriction at the upper T12/L1/L2 lumbar levels." *Id.* Thus, the second Spinoscopic test noted a significant improvement in Snyder's function (improvement from eighty-five percent to ninety-two percent). However, Dr. Dobson continued to observe poorly coordinated movement and stiffness, in addition to Snyder's complaints of increased pain. (T. 270–73).

Dr. Dobson also summarized the results of nerve conduction testing performed on October 23, 1996. (T. 270–71). His findings were "consistent with a congenital anomaly (Martin–Gruber anomaly)." *Id.* Subsequently, Dr. Dobson noted that Snyder's swelling of the right wrist might be related to De Quervain's tenosynovitis. After the nerve conduction testing, Snyder began physical therapy, which triggered increased back pain. (T. 267). Additionally, on January 9, 1997, Snyder reported an intolerance to cold. *Id.* On this date, Dr. Dobson completed a residual functional capacity ("RFC") assessment for the Social Security Administration. (T. 258–63). He noted that Snyder suffered from a stiff lumbar spine, back spasms, and bilateral carpal tunnel syndrome. *Id.* Dr. Dobson found that Snyder's ability to lift and carry was limited by her impairment. As such, he stated that she was limited to lifting or carrying a maximum of five pounds occasionally and a minimum of zero to three pounds frequently. *Id.* Additionally, he noted that her ability to stand, walk, sit, climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push and pull was limited by her impairment. *Id.* He determined that she can stand and/or walk three hours in an eight-hour work day with breaks every fifteen minutes and that she can sit for three hours in an eight-hour

3. Normal range of functioning is between seventy-six and ninety-five percent.

work day with breaks every fifteen minutes. *Id.* He linked her impairments to the Spinoscopic test results, which he believed revealed abnormal spine function, and to muscle spasms he observed during his routine exams of Snyder. *Id.*

On May 27, 1997, Dr. Dobson again reported to the Department of Social Services that Snyder was "totally disabled." (T. 264). He noted that Percocet was no longer alleviating her pain and then sent her for a consultation with the University of Rochester Pain Treatment Center. (T. 291). On examination, the Pain Treatment Center found many tender points on the paraspinous muscles. (T. 311–13). They recommended water hydrotherapy exercise. *Id.* A psychological evaluation revealed mild depression. (T. 314–17). She was diagnosed with unspecified adjustment reaction. *Id.* The Pain Treatment Center recommended twelve "behavioral medicine" sessions, which yielded minimal relief. (T. 318–24). In addition, Snyder reported falling on Thanksgiving Day 1997 for no apparent reason and having difficulty sleeping ever since. (T. 324).

Dr. Dobson prescribed an ice gripper for her cane on January 20, 1999. (T. 378). At this appointment, Snyder continued to complain of back pain and shoulder pain. *Id.* Moreover, Dr. Dobson noted a "tiny central disk protrusion at the L4 5 level" which "can be associated with significant loss of rotational stability." (T. 378–88).

## DISCUSSION

In determining whether plaintiff was entitled to receive disability benefits, the ALJ proceeded through the required five-step inquiry. *See Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999); 20 C.F.R. § 416.920. At the first step of this inquiry, the ALJ found that plaintiff had not engaged in substantial gainful activity since November 1992. (T. 19). Next, the ALJ found that plaintiff suffered from chronic low back pain and mild carpal tunnel syndrome, severe impairments that significantly limited her ability to do basic work activities. *Id.* The ALJ then found that these impairments did not meet or equal the criteria listed in 20 C.F.R. pt. 404, subpt. P, app. 1. *Id.* The ALJ proceeded to the fourth step and determined that plaintiff did not have the RFC to return to her past relevant work as a maid. *Id.* At the fifth and final stage of this process, the burden shifts to the Commissioner "to determine whether there is other work which the claimant could perform." *Tejada,* 167 F.3d at 774. The ALJ then applied the Medical Vocational Guidelines and found that plaintiff was capable of performing other types of work. *Id.; see* 20 C.F.R. part 404, subpart P, App. 2. Thus, the ALJ found that plaintiff was not disabled under the Act. This decision became the final decision of the Commissioner on May 26, 2000, when the Appeals Council denied plaintiff's request for review. (T. 4–6).

The Commissioner's decision that plaintiff was ineligible to receive benefits must be affirmed if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Thus, "[i]t is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999). Here, the ALJ's decision is not supported by substantial evidence.

Prior to issuing his decision, the ALJ submitted a series of interrogatories regarding plaintiff's condition and the testing

techniques used by Dr. Dobson to evaluate and diagnose plaintiff's condition to the New York State Office of Disability Determinations ("ODD"). Although the ODD did not specifically answer the interrogatories, it did respond with a short, seven-sentence letter generally discrediting the Spinoscope test. (T. 309). The letter was apparently based on an informal survey of colleagues by Medical Director Dr. I Arnold Slowe. The letter, however, was written by a third party, Medical Relations Officer M. Jane Herman. Although the interrogatories were submitted to the ODD on July 29, 1997 (T. 306), the response from ODD was authored on May 12, 1994 (T. 309).

The same set of questions was also posed to Dr. Dobson. On February 17, 1998, plaintiff's counsel notified the ALJ that Dr. Dobson required three or four additional weeks to respond. In a decision issued one week later, the ALJ denied this request, noting that over six months had passed since plaintiff's hearing. (T. 14)

Although the ALJ never reviewed Dr. Dobson's responses, Dr. Dobson's answers were submitted to the Appeals Council and, thus, are part of the record before this Court.[4] *See Perez v. Chater,* 77 F.3d 41, 44 (2d Cir.1996). In his detailed, six-page response, Dr. Dobson addressed the ALJ's specific questions and provided additional commentary concerning how the Spinoscope and MRI test results relate to plaintiff's individual circumstances and her medical condition.

 Social Security hearings are non-adversarial in nature. Thus, "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 111, 120 S.Ct. 2080, 147

L.Ed.2d 80 (2000). Moreover, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or ... by a paralegal.'" *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999) (quoting *Perez,* 77 F.3d at 47).

Despite assurances that Dr. Dobson's responses would be forthcoming, the ALJ elected to simply issued his decision without the benefit of the additional information that he had requested. This is especially troubling in light of the ALJ's determination that Dr. Dobson's opinions and assessment of plaintiff's RFC are of "low probative value." (T. 17). The ALJ discounted Dr. Dobson's opinions in part because Dr. Dobson relied on the Spinoscope test. The ALJ found that this test had "questionable scientific validity." *Id.* Unfortunately, the only information in the record at that time concerning the validity of the Spinoscope test consisted of the 1994 letter from the ODD.

This Court reviews many cases where a plaintiff's treating physician appears unwilling to amplify the record. In contrast, Dr. Dobson's eventual submission was detailed and directly responsive to the ALJ's inquiries. Although the delay in Dr. Dobson's response may have frustrated the ALJ, Social Security hearings are non-adversarial in nature. Plaintiff should not be penalized for her physician's delay, especially where the physician, through counsel, had indicated a willingness to supplement the record and to address the ALJ's queries.

 Based on the above, I find that the ALJ erred in issuing his decision without

---

4. Although Dr. Dobson's responses were submitted to the Appeals Council, the Appeals Council denied plaintiff's request for review. (T. 4). Hence, the ALJ's decision became the

final decision of the Commissioner. *See Perez,* 77 F.3d at 44. It is this decision, made without the benefit of Dr. Dobson's responses, that must be reviewed by this Court.

waiting for the additional information submitted by plaintiff's treating physician. As such, the ALJ did not fulfill his duty to fully develop the record. Therefore, the Court hereby remands this case to allow the ALJ to consider the responses of plaintiff's treating physician and any other information germane to plaintiff's claim.

■ While this case is again before the ALJ, he should review several other important aspects of his previous decision. First, the ALJ must carefully consider the weight assigned to the opinions of plaintiff's treating physician. "The medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir.2000); *see* 20 C.F.R. § 416.927(d)(2). In determining what weight to give a treating physician's opinion, the Commissioner must consider:

> (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of the treatment relationship"; (3) the extent of "relevant evidence" presented "to support an opinion"; (4) whether the opinion is consistent "with the records as whole"; (5) whether the opinion is offered by a specialist.

20 C.F.R. § 416.927(d)(2)(i)–(ii) & (d)(3)–(5). The ALJ is also required to articulate his or her "reasons for the weight [he or] she assigns to the treating physician's opinion." *Shaw*, 221 F.3d at 134.

At the time of the hearing, plaintiff had been seeing Dr. Dobson for three years. Dr. Dobson routinely examined Snyder every month or every other month. As such, Dr. Dobson was able to provide the ALJ with a detailed longitudinal record of Snyder's medical history. The ALJ, however, chose to disregard Dr. Dobson's opinion and to instead credit the opinion of the one-time examining consultative physician.

■ Second, the ALJ should carefully consider his assessment of plaintiff's RFC. In addition to the detailed justification for his treatment decisions and recommendations regarding the extent of plaintiff's impairments provided by Dr. Dobson, he also provided an assessment of plaintiff's RFC which suggested that plaintiff's ability to perform work activities is severely restricted. As discussed above, the ALJ on remand must carefully apply the treating physician rule. If, in fact, Dr. Dobson's opinion is to be credited, further development of the record will be required concerning plaintiff's ability to perform work given the restrictions suggested by Dr. Dobson.

■ Finally, the ALJ must carefully assess plaintiff's credibility and evaluate her subjective complaints of pain. For example, in his decision, the ALJ found that Snyder cared for her children's two Great Danes, even though she specifically stated at the hearing that she did not care for the animals. (T. 48). Furthermore, the ALJ focused heavily on the plaintiff's admitted daily capabilities, including driving herself to appointments, cooking for her family, doing light laundry, and grocery shopping with the aid of her fiancé in carrying the grocery bags. (T. 35–6, 44). Although a plaintiff's daily activities are relevant in evaluating her complaints of pain, 20 C.F.R. § 416.929(c)(3)(i), a plaintiff " 'need not be an invalid to be found disabled' under the Social Security Act." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir.1988)).

■ In addition, the ALJ noted that he observed the plaintiff sit for thirty-five minutes at the hearing without a break, despite her treating physician's determination that plaintiff would need breaks every fifteen minutes. While an ALJ may consider a claimant's "physical demeanor" at

the hearing in assessing the claimant's credibility, "such observations should be assigned only 'limited weight.'" *Schaal,* 134 F.3d at 502.

Finally, the ALJ also dismissed Snyder's complaints of pain by stating that she was not taking any medication at the time of the hearing or wearing a brace for her impairments. The ALJ failed to note that the University of Rochester Pain Treatment Center stated that they did not believe that any invasive medical procedure would help the plaintiff's pain. (T. 311–13). Additionally, the record indicates that some pain medications made Snyder nauseous or simply did not alleviate her pain. (T. 291, 383).

## CONCLUSION

The Commissioner's motion for judgment on the pleadings (Dkt. # 9) is denied. The plaintiff's motion for judgment on the pleadings (Dkt. # 12) is denied in part and granted in part. This case is remanded to the Commissioner for further findings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

