**Daniel BARKLEY, Plaintiff**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 02–CV–6271 CJS.**

United States District Court, W.D. New York.

March 3, 2003.

Mark M. McDonald, Esq., Bond and Mc-Donald, P.C., Geneva, NY, for Plaintiff.

Michael A. Battle, Esq., United States Attorney for the Western District of New York, Christopher V. Taffe, Esq., Assistant United States Attorney, Rochester, NY, for Defendant.

## DECISION AND ORDER

SIRAGUSA, District Judge.

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") which denied plaintiff's application for disability benefits. Now before the Court is plaintiff's motion for judgment on the pleadings [# 5] and defendant's cross-motion for judgment on the pleadings [# 11]. For the reasons stated below, plaintiff's motion is granted, defendant's motion is denied, and this matter is remanded.

## PROCEDURAL BACKGROUND

On October 6, 1998, plaintiff applied for Social Security disability benefits, claiming to be disabled due to "gout in right foot, high blood pressure, and lung disease." (R. 95, 115, 124).[1] The Social Security Administration denied plaintiff's application initially on January 7, 1999, and again on reconsideration, on March 11, 1999. On April 12, 1999, plaintiff requested a hearing before an ALJ, and a hearing was held on June 8, 2000. On July 27, 2000, the ALJ issued his decision, finding that plaintiff was not entitled to disability benefits. On May 8, 2002, the Appeals Council denied plaintiff's request for review. (R. 6–7). The ALJ's decision thus became the final decision of the Secretary. Plaintiff commenced this action on May 8, 2002, and filed the subject motion for judgment on the pleadings on November 20, 2002. Defendant filed the subject cross-motion for judgment on the pleadings on January 17, 2003. Counsel for both parties appeared before the undersigned for oral argument on February 13, 2003. The Court has thoroughly considered the parties' submissions, the comments of counsel, and the entire record.

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole

---

1. Unless otherwise noted, citations are to the Administrative Record.

or are based on an erroneous legal standard." *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal,* 134 F.3d at 501. The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal,* 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the defendant may carry its burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater,* 94 F.3d 34, 38–39 (2d Cir.1996) (citation omitted); *see also,* SSR 83–10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then defendant cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform." [2] *Id.* at 39; *see also,* 20 C.F.R. § 416.969a(d).[3]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and

---

**2.** "Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

**3.** 20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions.... [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2). The regulations further state that, "[u]nless we give a treating source's opinion controlling weight ... we consider all of the following factors in deciding the weight we give to any medical opinion. (1) Examining relationship.... (2) Treatment relationship.... (3) Supportability .... (4) Consistency .... (5) Specialization .... (6) Other factors." 20 C.F.R. § 416.927(d)(2).

Significantly, for purposes of the instant case, the regulations further provide that, "[w]hen the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as administrative law judges follow." 20 C.F.R. § 416.927(f)(3).

For purposes of the instant action, it is also necessary to note that "sedentary work"

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). The term "occasionally" means "occurring from very little up to one-third of the time." SSR 83–10. Generally, sedentary work involves sitting for six hours and standing or walking for not more than two hours in an 8–hour workday. *See, Ferraris v. Heckler*, 728 F.2d 582, 587, n. 3 (2d Cir.1984)(citing SSR–83–10).

## FACTUAL BACKGROUND

The facts of this case are set forth at length in the parties' submissions and in the Decision of the Administrative Law Judge ("ALJ"), and, unless otherwise indicated below, are not in dispute. It is sufficient to note the following facts. The 45–year–old plaintiff, a cigarette smoker for over 25 years, suffers from Chronic Obstructive Pulmonary Disease ("COPD"). (R. 200). Plaintiff's difficulty breathing is exacerbated by his morbid obesity. Plaintiff also has a history of hypertension, sleep apnea, and gout. Plaintiff previously worked as a trash collector (1987–1990), sorted vegetables in a canning factory (1990–91), trimmed pieces of plastic in a factory (1992–94), washed dishes in a restaurant (1994–97), and cleaned in a hospital (May 1998–June 1998). (R. 128). Plaintiff indicates that he became disabled on June 29, 1998, when his doctor "took [him] off work because of high blood pressure." (R. 115).

Plaintiff appeared at the hearing before the ALJ with his legal representative. There, plaintiff testified that, as a result of his COPD, he suffers shortness of breath walking less than a block. He stated that he uses an albuterol inhaler four times a day. Plaintiff also indicated that he suffers from sleep apnea, but that he uses a CPAP oxygen machine at night which allows him to sleep all night and remain awake all day. (R. 57, 61, 64). As for his gout, he testified that he cannot stand for long periods, because his "gout kicks in." (R. 53). However, he later clarified that his gout was "under control" with medication and diet, and that he had no gout episodes since he stopped working on June 26, 1998. Thus, at the time of the hearing, he had not experienced a gout flare-up for approximately two years. (R. 56, 61, 64). He also indicated that his hypertension

was under control with medication. (R. 63) When asked if he had any cardiac problems, he testified that his "heart is doing good." (R. 66–67). Plaintiff stated that he had never been hospitalized or needed emergency room treatment for his health problems. (R. 67).

Plaintiff stated that he left school after completing the eighth grade, and twice failed to obtain his GED. He attributed his failures to obtain his GED to his inability to stay awake during classes. (The Court notes, however, that these attempts were prior to plaintiff obtaining treatment for his sleep apnea, which had caused him to be drowsy. (R. 60)). Plaintiff indicated that he has no trouble reading, writing, adding, subtracting, multiplying, or dividing, and that he has no problems with memory or concentration. He also indicated that he does not experience any side-effects from his medications.

As for his daily activities, plaintiff said that he tries to do his own housework, but that it takes him hours to wash his dishes, because he cannot stand for long periods. He said that he occasionally has help cleaning his house and doing his laundry. He testified that is able to drive and go shopping, but said that while shopping, he needs to hold on to the shopping cart. He indicated that he spends his time "sitting around," watching television, sitting on his porch and talking to his neighbors (R. 58), and that he occasionally plays board games with friends. Plaintiff indicated that six months prior to the hearing, he was walking about half a mile per day on an exercise treadmill, but had stopped because he could not "do it anymore." (R. 66). Plaintiff stated that he can stand 15 to 20 minutes at a time. He indicated that if he stands for more than 15 to 20 minutes, he becomes "a little woozy" and feels as if he is "going to lose [his] balance." (R. 56). He said he can sit for 30 to 60 minutes at a time, and then becomes "fidgety." (R. 56). He testified he can lift and carry 15 to 20 pounds. (R. 57).

Plaintiff also submitted all of his relevant medical records to the ALJ. However, "[r]ather than recount every detail of [plaintiff's medical record, the Court] instead will briefly summarize their contents." *Pratts v. Chater*, 94 F.3d at 36.

*Plaintiff's Heart*

On July 2, 1998, Ronald Hainen, M.D., examined plaintiff's chest x-ray and noted "[m]ild cardiac enlargement. No evidence of overt failure or acute infiltrate." (R. 193). On August 7, 1998, John Cooley, M.D., speculated that some swelling in plaintiff's foot was "probably" a result of gout, but might be due to "right sided heart failure." (R. 213). However, Dr. Cooley never actually diagnosed heart failure, and the medical record does not indicate any heart problem other than mild cardiac enlargement.

*Gout*

On July 21, 1998, Michael Miller, M.D. examined plaintiff after plaintiff complained of pain in his right foot. Dr. Miller found no fracture or dislocation, and noted "possible gouty erosions in the head of the great toe metatarsal which could indicate gout but this is not classical radiographic appearance." (R. 192). On September 10, 1998, Dr. Cooley noted that plaintiff was complaining of a swollen and painful left foot. On December 10, 1998, George Sirotenko, M.D., an agency physician, examined plaintiff and concluded that plaintiff's gout was "currently well controlled" with medication. (R. 162). Dr. Sirotenko found "[n]o evidence of acute inflammatory gouty symptoms." (R. 164). He noted that plaintiff had a full range of motion in all joints, with no cyanosis, clubbing, or edema. (*Id.*). As a result, Dr. Sirotenko concluded that plaintiff had "no limitations" from gout. (R. 165).

*Hypertension*

On June 26, 1998, plaintiff's last employer, a hospital, informed Dr. Cooley by telephone that plaintiff's blood pressure was "very high." (R. 216). On June 29, 1998, Dr. Cooley found plaintiff's blood pressure to be 160/110. (R. 216). Dr. Cooley noted that plaintiff had previously been taking Zestril, a hypertension medication, but, for unspecified reasons, was "not taking [it] anymore." (R. 216). On December 10, 1998, Dr. Sirotenko noted a "marked elevation" in plaintiff's blood pressure, which was 172/134, and he directed plaintiff to contact his primary care physician immediately. (R. 163–65). However, on January 26, 1999, Thomas Jennings, M.D., noted that plaintiff's blood pressure had dropped to 122/72. (R. 201). Perhaps significantly, Dr. Jennings further noted that plaintiff was again taking Zestril. (R. 201). On November 5, 1999, Dr. Cooley found plaintiff's blood pressure to be 100/78. (R. 207). On June 20, 2000, Dr. Cooley noted that plaintiff was still taking Zestril. (r. 286). On November 2, 2000, plaintiff's blood pressure was 120/80. (R. 285). On March 9 2001, his blood pressure was 118/88. (R. 278).

*Sleep Apnea*

On February 10, 1999, Dr. Jennings noted that plaintiff was complaining of sleep apnea and unrefreshed sleep. On March 17, 1999, Dr. Jennings noted that plaintiff was using a prescribed CPAP machine at night to treat his sleep apnea, and that plaintiff was sleeping better and felt more refreshed. Thereafter, plaintiff continued to report that his sleep apnea was well-controlled by using the CPAP machine.

*Chronic Obstructive Pulmonary Disease (COPD)*

On October 29, 1998, Dr. Cooley noted that plaintiff suffered "[s]evere hypoxic lung disease, restrictive secondary to obesity, smoking habituation." (R. 210). On December 10, 1998, Dr. Sirotenko examined plaintiff and noted that he appeared "mildly dyspneic with physical activity." (R. 163). Dr. Sirotenko further noted:

> Pulmonary Function Test: Revealed a FVC[4] of 2.08 which was 57% predicted. FEV–1 of 1.42 which was 49% predicted. Proventil in the form of 2 puffs was administered with FVC remaining at 2.08 and an FEV–1 remaining at 1.41, both consistent with moderate obstructive disease of a fixed nature.

(R. 164). Plaintiff was not wheezing or in acute respiratory distress. (R. 166). Dr. Sirotenko noted that plaintiff "cooks his own meals, does his own laundry and does his own shopping. He does not need assistance dressing or bathing." (R. 163). Dr. Sirotenko concluded that plaintiff should not operate heavy machinery or situations in which falling asleep would put himself or others in danger, should not work in heights or unsupervised, and "would benefit from activities of a sedentary nature only." (R. 165).

On January 7, 1999, agency review physician Jon Miller, M.D., completed a residual functional capacity assessment indicating that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for 6 hours in an 8–hour work day, and sit for 6 hours in an 8–hour work day. (R. 174–81). Dr. Miller further noted that plaintiff had no limitations on his ability to push and pull, and had no postural limitations. He also indicated that plaintiff

---

4. FVC stands for "forced vital capacity," and is "the volume of air expired with maximum force." FEV1 stands for "forced expiratory volume in one second, in liters." MARK H. BEERS, M.D. & ROBERT BERKOW, M.D., THE MERC MANUAL OF DIAGNOSIS AND THERAPY, p. 521–22 (1999).

should avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases. However, it is unclear what information Dr. Miller reviewed in making this assessment, since he indicated that his file did not contain a statement from a treating or examining source. (R. 180).

On January 14, 1999, Dr. Cooley obtained a cardiopulmonary test which indicated an FVC of 2.07 and an FEV1 of 1.43, which is almost identical to numbers obtained by Dr. Sirotenko. (R. 183). Dr. Cooley opined that plaintiff had a moderate obstructive lung defect, with a severe decrease in diffusing capacity. (R. 183). On January 14, 1999, Michael Miller, M.D. obtained a chest x-ray which revealed "[c]hronic interstitial disease with prominence of central pulmonary vessels." (R. 184). On January 26, 1999, Thomas Jennings, M.D., a pulmonary specialist, examined plaintiff and found a moderate pulmonary obstruction. Dr. Jennings noted: "The degree of obstruction seen on the spirometry was in a moderate range. There is loss of diffusion capacity which would suggest that the obstructive changes are due to pulmonary emphysema with loss of capillary bed." (R. 202). Dr. Jennings noted that plaintiff's breathing difficulty did "not seem to be triggered by problems with exposure to perfumes, chemical spells [sic], dust or other environmental factors." (R. 201). Dr. Jennings advised plaintiff to lose weight, stop smoking, and walk at least 45 minutes twice a day. Dr. Jennings further prescribed bronchodilator inhalers, Albuterol and Azmacort. On March 17, 1999, Dr. Jennings noted that plaintiff was indicating that his breathing had improved as a result of using the inhalers.

On April 19, 1999, Dr. Cooley noted that plaintiff's "lung disease restricts him to sedentary light work only. I have recommended he consult with VESID about possible training. Prognosis for return to work is guarded." (R. 208). On September 9, 1999, Earl R. Robinson, Jr., M.D., noted that plaintiff complained of shortness of breath with walking. Dr. Robinson found plaintiff's FVC to be 2.08 and his FEV1 to be 1.37, and noted, "[s]pirometry shows evidence of mild obstruction." (R. 233). On November 5, 1999, Dr. Cooley noted that plaintiff had been exercising at home with a treadmill, but sometimes had to stop due to shortness of breath.

On February 3, 2000, Dr. Cooley completed a residual functional capacity evaluation form, indicating that plaintiff did not suffer from a condition which would be expected to produce pain, and that plaintiff should never climb, balance, stoop, crouch, kneel, crawl, bend, climb stairs, reach, push, or pull. (R. 237–38). Significantly, he stated that plaintiff should not stand at all during an 8–hour day, should walk only 5 minutes at a time, and only 30 minutes in an 8–hour day, and could sit for 8 hours. He indicated that plaintiff could lift 10 pounds at one time, and could lift less than 10 pounds for 3–6 hours per day. Dr. Cooley stated that plaintiff should avoid any dust, chemicals, dampness or humidity, or temperature extremes, and he noted that plaintiff had moderate shortness of breath, fatigue, and coughing, as well as mild dizziness, anxiety, and sweating.[5]

Plaintiff also submitted to the ALJ affidavits from his friend, Roger Keech, Sr., his sister, Barbara Bergstresser, and his sister, Tammy Darcy, in which they opine that Plaintiff would not be able to work because of his shortness of breath. (R. 148–160). They indicate that plaintiff is constantly short of breath. (*Id.*) In addi-

---

**5.** Plaintiff testified that when Dr. Cooley completed the functional examination report, he asked plaintiff questions, but did not conduct any tests. (R. 62)

tion, Mr. Keech indicated that plaintiff walks "bent over some from pains in his back or lower back." (R. 148). However, plaintiff does not complain of back pain, and his medical records do not mention back pain or support the claim that plaintiff walks bent over due to back pain. Ms. Bergstresser indicated that plaintiff "has a problem moving around and sitting as his hips, legs, and ankles are hurting." (R. 153–54). However, plaintiff does not complain of pain in his hips and legs, nor does the medical record suggest that he suffers pains in his hips and legs. Finally, Ms. Darcy indicated that plaintiff was "in pain," "no matter whether he was sitting or walking." (R. 157). However, the record does not otherwise indicate that plaintiff was "in pain," and, in fact, Dr. Cooley noted in his February 3, 2000 residual functional capacity assessment that plaintiff did not suffer from a condition that would be expected to cause pain.

## ALJ'S DECISION

As earlier indicated, on July 27, 2000, the ALJ issued a decision denying plaintiff benefits. Specifically, at step five of the five-step sequential analysis, the ALJ found that plaintiff possessed the residual functional capacity ("RFC") to perform a limited range of sedentary work. The ALJ stated:

> After carefully considering the entire record, including claimant's subjective complaints of disabling symptoms and limitations, a finding is warranted that the claimant's impairments preclude only the following work-related activities: standing and/or walking for more than a total of 2 hours in an eight hour workday; lifting more than 10 pounds. He can never climb ladders, ropes or scaffolds; balance on narrow, slippery or erratically moving surfaces; crouch; kneel; crawl; push or pull. He cannot more than occasionally climb stairs or

stoop. He must avoid even minimal exposure to toxic or caustic chemicals, dampness or humidity or temperature extremes and must avoid concentrated exposure to dust.

(R. 30). In reaching that determination, the ALJ first acknowledged that Dr. Cooley's opinion, if accepted, would result in a finding that plaintiff was disabled. (R. 37). However, the ALJ entirely disregarded certain portions of Dr. Cooley's report. For example, the ALJ gave "no weight" to Dr. Cooley's opinion that plaintiff should not stand at all during an 8–hour work day, and he also rejected Dr. Cooley's stated limitations on plaintiff's ability to climb stairs, balance, stoop, bend, reach, or be exposed to dust. (R. 37). In this regard, the ALJ stated that "the objective evidence" did not support Dr. Cooley's opinions. (R. 37). The ALJ further noted that Dr. Cooley's February 3, 2000 RFC assessment was inconsistent with his April 1999 statement that plaintiff could perform "sedentary/light work," and should seek job training. In this regard, the ALJ examined the medical evidence and concluded that there was no basis for Dr. Cooley to revise his opinion, since plaintiff's condition had not worsened. (R. 37). The ALJ did, however, accept Dr. Cooley's opinion insofar as it indicated that plaintiff could lift 10 pounds and sit for an entire 8–hour work day. (*Id.*). Further, the ALJ rejected plaintiff's claim that he could only stand for 15 to 20 minutes at a time before becoming dizzy, since there was no corroboration in the record. The ALJ also found that the medical evidence did not support a finding that plaintiff's heart, sleep apnea, gout or hypertension interfered with his ability to work. Instead, he found that those conditions were controlled with medication.

The ALJ then found that plaintiff's non-exertional impairments would not signifi-

cantly erode plaintiff's ability to perform sedentary work. The ALJ did not, therefore, employ a vocational expert, but instead, used the grids "as a framework" to determine that there were a significant number of jobs which plaintiff could perform. (R. 39).

## DECISION OF THE APPEALS COUNCIL

On August 8, 2000, plaintiff appealed the ALJ's decision to the Appeals Council. On October 18, 2001[6], plaintiff's counsel submitted a brief, along with additional medical records. Following are the relevant portions of those records. On June 20, 2000, Dr. Cooley noted that plaintiff was "pretty much restricted to his home environment because he does not have portable O2. Can ambulate flat surfaces fairly well for a limited time, but is unable to ambulate on any kind of incline." (R. 286). On November 2, 2000, Dr. Cooley noted that plaintiff "[c]omplains that he sometimes feels fatigued when he tries to [do] anything, not necessarily because of shortness of breath." (R. 285). On March 9, 2001, Dr. Cooley opined that plaintiff "remains totally disabled" because of COPD. (R. 278).

On August 17, 2001, J. Richard Tyner, M.D., a pulmonary specialist, examined plaintiff and wrote to Dr. Cooley that plaintiff

develop[s] shortness of breath while walking but 25 yards on level ground. Certainly, ascending a flight of stairs is all the worse. He has experienced this degree of dyspnea for the past two years at least, and has not been able to work for some time due to his respiratory symptoms. . . . He coughs daily . . . . He will also wheeze with exertion. . . . Walk-

ing but 25 yards on level ground . . . he is obviously uncomfortable even at this modest amount of work. . . . The impression today would be emphysema, severe, occupationally disabling, for which a pulmonary function study would be required for objective documentation. . . . Obviously, cigarette cessation is important, [but] I do not sense that this will be successful given education, social support. He really should be on continuous nasal oxygen 2 LPM both day and night as he has resting hypoxemia in the office today. . . . All factors considered, Mr. Barkley is occupationally disabled by virtue of his severe obstructive airways disease. He does not satisfy specific SSA criteria for such, but he is also hypoxic, and there is no way that a gentleman with this lack of education and lack of insight into his medical illness could sustain a job and use continuous oxygen as well.

(R. 293–94). Dr. Tyner noted at that time that plaintiff's FVC was 2.23 and his FEV1 was 1.32. On October 2, 2001, Dr. Tyner again wrote to Dr. Cooley, noting that, although plaintiff was supposed to have taken a pulmonary stress test, "upon presentation the patient was coughing frequently, obviously dyspneic on basic walking. His spirometry and oximetry studies had deteriorated from August of this year and thus the study was not undertaken." (R. 287). He further noted that plaintiff had "obstructive airway disease, with a component of restriction to ventilation secondary to his exogenous obesity and muscle deconditioning," and that plaintiff was "also intoxicating himself with cigarette smoke." Dr. Tyner further stated:

By his spirometry, Mr. Barkley now qualifies for disability as published by

6. The delay in filing the plaintiff's brief was attributable to the defendant's failure to provide plaintiff's counsel with a copy of a recording of the hearing and copies of exhibits. (21–25)

the Social Security Administration in their booklet "Disability Evaluation Under Social Security," page 32 of the 1985 edition.... Mr. Barkley is unfit for work by virtue of: (1) obstructive airway disease, severe, (2) restrictive thoracic disease secondary to obesity, severe, (3) hypoxemia.

(R. 287). Dr. Tyner noted that plaintiff's FVC was 1.58 and his FEV1 was 1.12. On October 15, 2001, Dr. Tyner completed an RFC assessment, indicating that plaintiff should never climb, balance, stoop, crouch, kneel, crawl, bend, climb stairs, reach, push, or pull. He indicated that plaintiff could stand 30 minutes at a time, and stand for a total of 2 hours during 8–hr workday, but could walk continuously for only 5 minutes, and could only walk 40 minutes during an 8–hour workday. Dr. Tyner stated that plaintiff could sit continuously for 2 hours, and could sit for 6 hours in an 8–hour workday, but would need to alternate between sitting and standing. He noted that plaintiff could lift and carry less than 10 pounds. Finally, Dr. Tyner opined that plaintiff should avoid minimal exposure to dust, odors, fumes, chemicals, dampness/humidity, mold, extreme temperatures. (R. 297–98).

As previously indicated, on May 8, 2002, the Appeals Council denied plaintiff's request for review.

## ANALYSIS

The primary issue in this action is whether or not, at step five of the five-step sequential analysis, the defendant carried her burden of demonstrating that the plaintiff was capable of performing "other work." Thus, the question is whether or not the ALJ correctly determined that plaintiff had the residual functional capacity to perform "a limited range of sedentary work." In that regard, the Court notes that, according to the Social Security Administration, "[a]n RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare." SSR 96–9p.

At the outset, however, the Court must determine what evidence should be considered. Specifically, the Court must determine the significance of the additional medical evidence which plaintiff submitted to the Appeals Council after the administrative hearing, namely, medical notes from Dr. Cooley for the period after the hearing, June 20, 2000, through March 9, 2001 [7], and the two reports from Dr. Tyner.[8] As to those types of supplementary submissions generally, the Commissioner's regulations, 20 CFR § 404.970(b) state, in relevant part:

---

7. The exhibit list erroneously indicates that those records, consisting of records from Dr. Cooley, cover the period November 28, 2000 through March 9, 2001. In fact, Exhibit AC–1, as it pertains to Dr. Cooley's notes, covers the period June 20, 2000 through March 9, 2001. (R. 278–286).

8. The record indicates that two exhibits were submitted to the Appeals Council: "Exhibit AC–1 Records and statement from John Cooley, M.D., dated November 28, 2000[sic], through March 9, 2001", and "Exhibit AC–2 Records from Richard Tyler [sic], M.D., dated August 17, 2001." While it would appear, then, that the Appeals Council only had one

report from Dr. Tyner, the one dated August 17, 2001, the Court finds that the Appeals Council also had Dr. Tyner's second report, dated October 2, 2001, as well as a residual functional capacity assessment which Dr. Tyner completed on October 15, 2001. The Court makes this finding based upon the "AC Exhibit List" found at page 5 of the record, which indicates that Exhibits AC–1 and AC–2 are found at pages 278–298 of the record. Dr. Tyner's October 2, 2001 report is found at page 287 of the record, and his October 15, 2001 RFC assessment is found at pages 295–98 of the record.

If new and material evidence is submitted, the Appeals Council shall consider the additional evidence *only where it relates to the period on or before the date of the administrative law judge hearing decision.* The Appeals Council shall evaluate the entire record including the new and material evidence submitted *if it relates to the period on or before the date of the administrative law judge hearing decision.*

(Emphasis added). Here, the first question to be resolved is whether or not the Appeals Council, in making its determination, actually considered the additional records submitted by plaintiff, or whether it refused to consider those records, on the grounds that they did not relate to the period on or before the ALJ's decision. Defendant, in her brief, indicated that the Appeals Council properly refused to consider those records, since they did not relate to the period on or before the ALJ's decision. (Defendant's Memo of Law, pp. 8–9). Moreover, during oral argument, defendant's counsel maintained that the Appeals Council had found the additional materials to be immaterial, although he acknowledged that the Council had not done so expressly. It is unclear whether or not plaintiff believes the Appeals Council considered the records, although he asserts that the ALJ "should be given the opportunity to review and evaluate" them. (Plaintiff's Reply Memo, p. 2).

It appears to the Court that the Appeals Council did in fact consider the additional medical records in reaching its determination. The Appeals Council's decision states, in relevant part:

The Appeals Council has also *considered* the contentions raised in your representative's letter dated October 18, 2001, *as well as the additional evidence [Exhibits AC–1 and AC–2, which as noted above, includes both of Dr. Tyner's reports] also identified on the attached Order of the Appeals Council,* but concluded that neither the contentions nor the additional evidence provides a basis for changing the Administrative Law Judge's decision.

(R. 6)(emphasis added). The Court further notes the contrast between this statement and other statements which the Appeals Council has made to other applicants in situations where it found additional evidence to be outside the scope of 20 CFR § 404.970(b). *See, e.g., Reyes v. Barnhart,* No. 01 Civ. 1724(JGK), 2002 WL 31385825 at *8 (S.D.N.Y. Oct. 21, 2002)("The Appeals Council determined that the additional submissions by [plaintiff's doctors] were not material to the issue of whether the plaintiff was disabled on or before ... the date of the ALJ's decision. The Appeals Council directed the plaintiff to file a new application for benefits if he wished to receive benefits on the basis of disability developed after [the date of the ALJ's decision].") Moreover, at least some of the information contained in those statements pertains to the period on or before the ALJ's decision. Nonetheless, the Appeals Council dismissed those medical opinions without even discussing them.

 The Court therefore finds that this matter must be remanded to the ALJ, since it is unclear how these additional records were evaluated, and what weight, if any, was given to the opinions of plaintiff's treating physicians. *See, Schaal v. Apfel,* 134 F.3d at 504 (Holding that remand is appropriate where there is "a reasonable basis for doubt whether the ALJ applied correct legal principles.").

 The Court also finds that the ALJ erred in granting no weight to portions of Dr. Cooley's RFC assessment. Clearly, certain portions of that report are seemingly at odds with other evidence in the record. For example, while Dr. Cooley opined that plaintiff could not stand at all during an 8–hour day, plaintiff indicated

**282**

that he could stand for 15 to 20 minutes at a time, and even Dr. Tyner's RFC assessment, completed when plaintiff's condition had worsened, indicates that plaintiff could stand and/or walk for almost three hours a day. Nonetheless, the law in this Circuit indicates that rather than rejecting Dr. Cooley's opinion, or substituting his own opinion, the ALJ should have sought additional information from Dr. Cooley. *See, Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."); *see also, Id.* at 134 ("Neither the trial judge nor the ALJ is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion."); *Schaal v. Apfel*, 134 F.3d at 505 ("The lack of clinical findings complained of by the ALJ did not justify the failure to assign at least some weight to [the treating physician's] opinion.... [E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the physician] *sua sponte*.") In any event, before rejecting Dr. Cooley's opinions, the ALJ did not consider all of the factors required by 20 C.F.R. § 416.927(d)(2).

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for judgment on the pleadings [# 5] is granted, and defendant's motion for judgment on the pleadings [# 11] is denied. This case is remanded, pursuant to 42 U.S.C. § 405(g), sentence four, to allow the ALJ to analyze the evidence in accordance with the regulations, and to develop the record as may be needed. *See, Schaal v. Apfel*, 134 F.3d at 505.

So Ordered.