Paul **CASERTO,** Plaintiff,

v.

Jo Anne B. **BARNHART,** Commissioner of Social Security, Defendant.

No. 02–CV–5718(ADS)(ETB).

United States District Court, E.D. New York.

March 25, 2004.

Fusco, Brandenstein & Rada, P.C., Woodbury, NY (John Antonowicz, of Counsel), for Plaintiff.

Roslyn R. Mauskopf, United States Attorney, by Kevin P. Mulry, Assistant United States Attorney, Central Islip, NY, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Paul Caserto ("Caserto" or the "plaintiff") commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security (the "Commissioner") denying disability benefits to him. Both parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ("Fed. R. Civ.P.").

## I. BACKGROUND

### A. Procedural History

On March 7, 2000, Caserto filed an application for social security disability insurance benefits, alleging an inability to work since August 3, 1998. After his application was denied initially and on reconsideration, he requested a hearing before an administrative law judge. On May 16, 2001, a hearing was held before Administrative Law Judge Sy Raynor (the "ALJ"). At the hearing, the plaintiff was represented by an attorney.

In a decision dated June 12, 2001, the ALJ found that Caserto failed to sustain his burden of proving that he was prevented by his impairment from performing past relevant light work as an automobile salesman or service manager. Therefore, the ALJ concluded, Caserto was not disabled within the meaning of the Act and was therefore not entitled to disability insurance benefits. Subsequently, Teta filed a request for review with the Appeals Council. On September 13, 2002, the Appeals Council declined to review the claim,

making the ALJ's decision the final administrative determination. This appeal followed.

### 1. Caserto's Testimony at the Hearing

The plaintiff was born on June 1, 1961 and has a 10th grade education. From approximately 1992 to February, 1997, the plaintiff worked as an auto repair shop service manager. Caserto's back pain began on January 11, 1996, when he slipped and fell on a wet cement floor. He was seen by Charles J. Mascioli, M.D. The plaintiff testified that as a result of this accident he suffered from disc damage to his lower back and cervical spine which caused muscle spasms, numbness and tingling in his hands, and constant pain in his neck, back and left leg. The plaintiff also injured his right shoulder and right wrist in that accident. As a result of the injuries caused by the fall, the plaintiff could no longer work as an auto repair shop service manager. In February, 1997, the plaintiff left that position.

In November, 1997, the plaintiff commenced work as an automobile salesman. On February 8, 2000, the plaintiff completed a Disability Report in which he indicated that this position required him to walk five hours, stand five hours, sit five hours during the course of the workday, bend, kneel, crouch and crawl. The plaintiff testified that was not able to concentrate, had to lie down for four to five hours a day, had constant tingling in his hands and constant pain in his neck, back, left leg and right wrist. As a result, on or about August 3, 1998, the plaintiff left this job.

On July 18, 1999, the plaintiff was struck by a car while filling his motorcycle with gas at a gas station. The plaintiff indicated that from the time the he left his employment as an automobile salesperson he rode his motorcycle only about three to four times so that he could keep the battery charged. The plaintiff testified that he was filling his motorcycle with gas so that a prospective purchaser could test drive it and that the gas station was a mile and a half from his house.

The plaintiff testified that he received trigger point and Botox injections, but did not have surgery. The plaintiff is separated from his wife and has visited his children in Florida one time and occasionally visits friends. The plaintiff indicated that he cared for his personal needs and dressed himself, but stated that he had difficulty putting on clothes because he could not bend or move. He paid bills, wrote checks and did his own banking. He drove as tolerated, including to the hearing and to physical therapy five times per week. The plaintiff testified that he could walk one and one half blocks at a time, could sit for twenty minutes at a time and lift ten to fifteen pounds. He has difficulty going up and down stairs. He makes his bed and tries to do chores but does not cook or grocery shop. The plaintiff's father assists him with these tasks. The plaintiff also has difficulty climbing stairs. He also read, listened to the radio and watched television.

### 2. The Treating Physicians

#### a. Dr. Shafi Wani

Shafi Wani, M.D. ("Dr.Wani"), a neurologist, treated the plaintiff on a monthly basis from April 4, 1998 through April 19, 1999. On April 4, 1998, Dr. Wani reported that the plaintiff's condition was normal but noted bilateral neck muscle stiffness and tenderness. On June 8, 1998, Dr. Wani indicated that the plaintiff's condition had not changed and that he was still experiencing stiffness and tenderness of the right cervical shoulder and arm muscles. In November, 1998 and in January and February 1999, Dr. Wani found sensory deficits in the plaintiff's upper extremi-

ties. From August to October 1998 and in April 1999, sensation was grossly intact.

During the time that Dr. Wani treated the plaintiff, lumbar flexion ranged from 45 to 60 degrees out of ninety, and extension and lateral flexion were generally possible to fifteen degrees out of forty-five. The straight leg-raising test was generally negative when performed in a seated position and was to sixty degrees out of ninety while supine. Cervical extension and right rotation were forty-five degrees out of ninety on one occasion and cervical extension and left rotation were once full. On two occasions, lumbar flexion was thirty degrees out of forty-five on the right. Lasegue's sign was either negative or could not be evaluated. Dr. Wani also found cervical, lumbar and extremity stiffness and tenderness. He continued to recommend exercises and massage therapy.

In a February, 1999 Workers Compensation report, Dr. Wani opined that the plaintiff had a permanent, partial disability since January, 1996.

### b. Dr. Charles E. Argoff

Charles E. Argoff, M.D. ("Dr.Argoff"), a pain management specialist, treated the plaintiff from September 1998 to April 2001. On September 25, 1998, Dr. Argoff found paracervical trigger points and pain on palpatation of the paralumbar, sacroiliac and sciatic regions. He noted post-traumatic cervical and lumbar myofascial and radicular complaints since 1996. Dr. Argoff found pain on palpatation of his paralumbar region at L3–4 and L4–5 bilaterally, decreased motion in the cervical spine and the back with paraspinal tenderness. Forward flexion of the lumbar spine was possible to sixty degrees. The plaintiff was alert and oriented and cranial nerve examination was unremarkable. Motor examination revealed a normal gait and normal heel, toe and tandem walking. Strength was full in the extremities with

no abnormal sensation. Deep tendon reflexes were normal and symmetrically active. Dr. Argoff recommended a twelve week pain rehabilitation program, lumbar epidural steroid injections and, possibly, myofascial trigger point injections.

On July 30, 1999, Dr. Argoff noted that motor examination was normal, deep tendon reflexes were normally active, and strength was full. There was significant muscle spasm and cervical, upper extremity and lumbar myofascial trigger points. Dr. Argoff prescribed Zanaflex to reduce muscle spasm and Vioxx, an anti-inflammatory medicine.

On August 13, 1999, Dr. Argoff noted that the plaintiff indicated that his medications had provided little relief. On September 17, 1999, the plaintiff was ready to participate in the comprehensive pain management program consisting of physical therapy and behavior therapy and noted that the plaintiff was not likely to have complete pain relief. On September 29, 1999 the plaintiff's muscles were less tense and felt better.

On October 27, 1999 the plaintiff reported that he was benefitting from the pain management behavioral sessions. He had extremely painful trigger points in the suboccipital and paracervical regions. Dr. Argoff gave the plaintiff muscular injections and stated that the plaintiff could not return to work at that time. Dr. Argoff prescribed a Liboderm patch.

On November 3, 1999, the plaintiff reported a solid week of pain relief following his trigger point injections. On November 10, 1999, Dr. Argoff reported that the plaintiff strained his lower back and neck and had painful muscle spasms in the lower right thoracolumbar area and in the right paracervical region. The plaintiff received trigger point injections which helped relieve this pain.

On December 1, 1999, the plaintiff was doing well and was more comfortable for almost ten days after the last injection. On December 15, 1999, Dr. Argoff found myofascial trigger points. On December 29, 1999, the plaintiff was doing relatively well and was managing with his current medications and benefiting from the injections.

On January 12, 2000, the plaintiff had active trigger points and severe paracervical discomfort but the injections had helped the plaintiff significantly. On January 28, 2000, February 4, 2000 and March 3, 2000 the plaintiff had muscle spasms, pain and trigger points.

On September 25, 2000, the plaintiff reported that his medication regime made him more comfortable but complained of neck pain and had active trigger points. On October 23, 2000 the plaintiff also complained of range of motion limitations. On November 27, 2000, Dr. Argoff noted that his medications had helped the plaintiff to function "much more comfortably."

On January 8, 2001, the plaintiff had noticeable tingling in his fingers, negative Tinel's and Hoffman's signs and intact reflexes and sensation. He had some weakness in his left triceps but not his wrists. Dr. Argoff treated him with Botox injections. On February 12, 2001, as a result of the Botox injections, the plaintiff reported slight movement and was much more comfortable. His spasms, which increased in cold weather had been reduced by medication. On March 12, 2001, Dr. Argoff noted that Botox had produced an excellent response. On April 23, 2001, Dr. Argoff found active trigger points but noted that the plaintiff had very good pain control except for localized pain and spasm in the scapular muscle.

### c. Dr. Jonathan Dashiff

On July 28, 1999 the plaintiff was seen by Jonathan Dashiff, M.D. ("Dr.Dashiff")

after he was struck by a motor vehicle while fueling his motorcycle ten days earlier. The plaintiff had tenderness, a laceration and ecchymotic changes in his left leg. The plaintiff had pain while performing straight leg raising to seventy degrees. Deep tendon reflexes were symmetrical and intact. Plaintiff had mild paravertebral muscle spasm, pain on palpation of the lumbar spine and on forward flexion and rotation of the cervical spine. Cervical extension was full but the plaintiff had pain on forward flexion and left rotation of the cervical spine. X-rays of the lumbrosacral spine, ribs and shoulders were negative. Dr. Dashiff noted significant tenderness over the junction of the middle and distal third of the left tibia/fibula and the presence of a small foreign body. Dr. Dashiff noted that the plaintiff also had pre-existing disc pathology which was complicating his condition. Dr. Dashiff recommended physical therapy, anti-inflammatory medication and Vicodin. Dr. Dashiff recommended that the plaintiff continue physical therapy.

On August 19, 1999, Dr. Dashiff noted that the plaintiff was only minimally improved and that his neck and lower back continued to be "significantly symptomatic." Dr. Dashiff also noted that the MRI of the cervical spine conducted post-accident significantly differed from the previous MRI. In particular, Dr. Dashiff indicated that the new MRI revealed bulging discs at C4–C5 and C5–C6 where the original MRI only revealed a bulge at C6–C7.

On September 9, 1999, Dr. Dashiff reported that the patient's MRI revealed "significant disc pathology" and that his improvement since that MRI had been "negligible to say the least."

On September 13, 1999, Dr. Dashiff reported, among other things, that the plaintiff's "pre-existing discal pathology" in

both the cervical and lumbosacral spine was complicating the plaintiff's condition.

### d. Deer Park Medical Office—Dr. Rodriguez and Dr. Bash

On July 30, 1999, the plaintiff saw Fidel Rodriguez, M.D. ("Dr.Rodriguez"), a physical medicine and rehabilitation specialist. Dr. Rodriguez found that his cervical range of motion was restricted and there was tenderness and spasm over the trapezius. His strength was five out of five, his sensation was intact and his upper extremity reflexes were symmetrical. Dr. Rodriguez noted that the plaintiff's chest wall was tender and he had an abrasion and tenderness in his left leg with full range of ankle motion. Dr. Rodriguez opined that the plaintiff had rib and ankle sprains and was status pose shin laceration and status post traumatic vertebral derangement, with instability in the cervical paraspinal muscles and ligaments and possible radiculopathy, as well as prior cervical disc herniation. Physical therapy was recommended.

On September 1, 1999, the plaintiff had a restricted cervical range of motion, cervical and trapezius tenderness, a full range of motion in his elbow, a negative Tinel's sign and a swollen and tender left ankle. Dr. Rodriguez diagnosed status post left ankle sprain and persistent cervical pain symptoms and dysfunction, with disc herniation and bulges, and possible cervical radiculpathies and ulnar neuropathy. He continued the physical therapy program.

On October 7, 1999, Dr. Rodriguez reported that the plaintiff had cervical and trapezius tenderness and a reduced rang of cervical spine motion.

On December 2, 1999, Robin Bash, M.D. ("Dr.Bash") indicated that an MRI showed a C 4–5 and C5–6 posterior disc bulge with C6–7 posterior herniation. However, the plaintiff ambulated into the office in no acute distress. He had mild to moderate cervical, rhomboid and trapezius tightness and tenderness. Cervical rotation was decreased, but extension and flexion were full. Upper extremity motor strength and grasp were normal except it was five minus out of five strength in the triceps. Sensation was intact and reflexes were 2–3+ and symmetric. He could heel and toe walk without difficulty and had five minus out of five strength of the ankle invertors and evertors.

On January 2, 2000, the plaintiff had decreased cervical lateral rotation, with moderate spasm, tenderness and upper extremity muscle tightness. Left ankle strength was normal, except for five minus out of five strength in the invertors. Dr. Bash recommended reduced physical therapy, home exercise and a TENS unit. On January 10, 2000, Dr. Bash opined that the July, 1999 accident caused a disc herniation at C6–7.

On February 17, 2000 the plaintiff's condition was unchanged. He had cervical and trapezius tightness and lumbar tightness and tenderness. Straight leg raising was negative on the right, but elicited pain on the left. Dr. Bash recommended acupuncture and physical therapy.

### 3. The Consulting Physicians

### a. Dr. S. Gowd

On May 26, 2000, New York State agency medical consultant, Dr. S. Gowd ("Dr. Gowd"), an internist, completed a "Physical Residual Functional Capacity Assessment." Dr. Gowd opined that the plaintiff could lift up to ten pounds frequently and twenty pounds occasionally, stand and/or walk for about six hours a day and sit for about six hours a day in an eight hour workday. Dr. Gowd concluded that the plaintiff had an unlimited ability to push and pull and could occasionally perform postural activities. He had no manipulative limitations. The evidence that Dr.

Gowd cited to support this assessment, included findings of normal gait, intact manipulative ability, absence of atrophy and muscle weakness and an ability to heel and toe walk. Dr. Gowd also checked a box indicating that there are no treating or examining source statements regarding the claimants physical capacity on file. On June 28, 2000, a Dr. C. Ladapoulos confirmed this assessment.

### b. Dr. Rashed Ayyub

On May 2, 2000, At the request of the Social Security Administration, Caserto was evaluated by Rashed Ayyub, M.D. ("Dr.Ayyub"), a specialist in emergency medicine. Dr. Ayyub noted that the plaintiff had a normal gait and station, could walk on his heels and toes and could get on and off of the examining table. He had a lot of cervical spine spasm and tenderness. He could flex his cervical spine to thirty degrees, extend to ten degrees, laterally flex to fifteen degrees and rotate to twentyfive degrees. He had pain and tingling in his upper extremities. His reflexes were 2+, with no weakness or atrophy. Caserto could touch his thumb to his fingers, make a fist, manipulate objects, write, button, open a cap and zip a zipper. Grip strength was five out of five. Tinel's sign was negative. Daily activities included watching television, reading newspaper, and taking short walks.

Dr. Ayyub noted herniated intervertebral discs in the cervical and lumbosacral regions and found "a lot of" tenderness and muscle spasm in the cervical and lumbosacral spines with diminished motion. Plaintiff flexed and extended his lumbosacral spine to thirty-five degrees and laterally flexed to ten degrees. He flexed his hips to forty-five degrees, extended to ten degrees and rotated, abducted and adducted without pain. Plaintiff's knees were moderately swollen and there were clicks on flexion and extension, which were possible to 110 degrees. Reflexes were 2+ and

there was no muscle atrophy. The plaintiff had tingling in inner side of both extremities and no muscular weakening.

Dr. Ayyub's diagnostic impressions included post concussion syndrome, herniated cervical and lumbosacral discs, brachial plexus neuralgia, sciatica and ligamentous and cartilaginous knee injuries. Dr. Ayyub concluded that the plaintiff was moderately impaired for sitting and standing continuously for more than a few hours uninterrupted and for walking more than a few blocks uninterrupted. He also was moderately impaired in his ability to lift more than a few pounds.

### b. Dr. Craig Rosenberg

On December 4, 2000, Mr. Caserto was examined by Craig H. Rosenberg, M.D. ("Dr.Rosenberg"), a doctor of physical medicine and rehabilitation at the plaintiff's request. Dr. Rosenberg diagnosed chronic pain syndrome with myofascial pain and MRI findings consistent with herniated discs in the cervical and lumbar regions. The plaintiff could dress and move on the examining table independently. There was no spinal scoliosis or kyphosis and no signs of atrophy. He noted positive findings, including flattening of the normal lumbar lordotic curvature, moderately protracted shoulders, observable shaking of both hands occurring intermittently, limited trunk motion and muscle spasms in the bilateral rhomboid muscles. Sensation was intact, the straight leg raising test was negative while seated and performed to seventy degrees while supine. Patrick–Fabere's test showed tightness of the hips. There was mildly reduced inter-segmental mobility of the lumbar spine and evidence of rhomboid muscle spasm. Plaintiff had mild limitations in his cervical spine range of motion and a full range of extremity and shoulder motion. Trunk flex-

ion was possible to forty degrees, extension to twenty degrees and bending to thirty degrees.

Dr. Rosenberg indicated that the plaintiff could stand for three hours, for thirty minutes at a time, sit for three hours, for twenty to thirty minutes at a time and lift ten pounds occasionally. He also needed to lie down during the day. He could not do postural activities and his impairments affected his ability to reach, handle, push, feel and concentrate. Dr. Rosenberg indicated that the objective findings conform to and substantiate subjective complaints. Dr. Rosenberg indicated that prognosis for recovery is poor considering the length of time the plaintiff has been disabled.

### 4. The Diagnostic Tests

An MRI performed on April 11, 1996 demonstrated central herniation at L4–5 and L5–S1, and an annular tear at L4–5.

An MRI scan performed on February 1, 1998, predating the alleged onset date in this case, showed a minimal bulging disc at C6–7. An MRI scan of the cervical spine on August 10, 1999 demonstrated cervical kyphosis with reflex muscle spasm, a herniated disc at C6–7 and bulging discs at C4–5 and C5–6.

Electro-diagnostic studies in May 1998 were negative. However, an EMG was performed on September 7, 1999 and demonstrated findings consistent with bilateral C6–7 radiculopathies, on the left greater than right.

### B. The ALJ's Decision

The ALJ made the following findings in his decision denying the plaintiff's request for SSI benefits.

First, he found that the plaintiff met the special earnings requirements of Title II of the Social Security Act on August 3, 1998 and has continued to meet them through December, 2003. Second, the ALJ determined that the plaintiff had not engaged in substantial gainful activity since August 3, 1998. Third, he found that the plaintiff had the following severe impairments: chronic cervical and lumbosacral spine strains/sprains and noted that these medical findings do not meet or equal in severity the clinical criteria of any impairment listed in Appendix I, Subpart P, Part 404 of the Regulations. Fourth, he concluded that the plaintiff's testimony concerning his conditions and limitations was not supported by objective clinical examination findings and "was inconsistent with his description of a broad range daily activities which included driving a car, going to the barber, bathing and dressing himself, making his bed, going to the bank and ATM and riding a motorcycle after his alleged onset date...." Fifth, the ALJ concluded that the claimant, despite his impairment(s) remains capable, in an eight hour workday of sitting six hours, standing/walking about six hours and of lifting/carrying up to twenty pounds occasionally and ten pounds frequently.

Finally, the ALJ concluded that the plaintiff had failed to sustain his burden of proving that he is prevented by his impairments from performing past relevant light work as an automobile salesman or service manager. Accordingly, the ALJ concluded that the plaintiff was not disabled under Title II of the Act.

## II. DISCUSSION

### A. The Legal Standard

■■■ To review the Commissioner's decision, the Court must determine whether (1) the Commissioner applied the correct legal standard, *see Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999); and (2) the decision is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *Brown v. Apfel*, 174 F.3d 59, 61–62 (2d Cir.1999). Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), and requires enough evidence that a reasonable person "might accept as adequate to support a conclusion." *Brown*, 174 F.3d at 62–63.

■ In determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting interferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam)). In addition, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating the evidence, " 'the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon *de novo* review.' " *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human* Servs., 733 F.2d 1037, 1041 (2d Cir.1984)).

■ Remand of a disability claim for further administrative procedures is an appropriate remedy where, among other things, (1) "there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . ," *Rosa v. Callahan*, 168 F.3d 72, 82–83, or (2) new, material evidence is adduced that was not produced before the agency. *See Raitport v. Callahan*, 183 F.3d 101, 104 (2d Cir. 1999) (citation omitted)

## 1. The Treating Physician Rule

■ The Commissioner must accord special evidentiary weight to the opinion of the treating physician. *See Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 119 (2d Cir.1998). The "treating physician rule," as it is known, "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir.2000); *see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999); *Clark*, 143 F.3d at 119; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2nd Cir.1993).

■ If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)).

■ Here, the ALJ identifies Dr. Dashiff and Dr. Argoff as the plaintiff's treating physicians. In addition to failing to acknowledge Dr. Wani and Drs. Rodriguez and Bash from Deer Park Medical Office, who were also treating physicians, the ALJ failed to state what weight he accorded to the opinion of Dr. Dashiff, and Dr. Argoff. *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993) (holding that the ALJ is required to articulate the weight that is given to treating doctor's conclusions).

On several occasions, Dr. Dashiff indicated that the plaintiff has discal pathology and bulging discs. Dr. Dashiff also noted that the July 18, 1999 accident aggravated his previous condition. In his analysis of Dr. Dashiff's treatment, ALJ merely "question[ed] how the claimant, with all his previous complaints of injuries, was able to drive his motor[cycle] after his alleged onset date." However, during his testimony, the plaintiff indicated that he no longer rode his motorcycle and was preparing the motorcycle to be sold when he was hit by a car.

 With respect to Dr. Argoff, who examined the patient more than fifteen times from September, 1998 to April, 2001, the ALJ failed to address Dr. Argoff's diagnoses that the plaintiff had post-traumatic cervical and lumbar myofascial as well as radicular complaints, significant muscle spasm and myofascial trigger points present throughout his back muscles. Moreover, the ALJ failed to acknowledge Dr. Argoff's October 27, 1999 conclusion that the plaintiff was not able to return to work at that time. *See Clark*, 143 F.3d at 118. The ALJ also failed to indicate the weight given to Dr. Argoff's opinion. (When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion."); *see also Baybrook v. Chater*, 940 F.Supp. 668, 674 (D.Vt.1996) ("Because the ALJ failed to apply the [C.F.R. 1527(d)(2)] factors properly, it is impossible to assess whether the treating physician's opinion was properly rejected. In light of this failure, and because the record contains evidence supporting the findings of either disability or no disability, the case must be remanded for application of the correct legal standard for assessing the weight to accord the treating physician's opinion." (citation omitted)).

Accordingly, the ALJ's failure to credit the findings set forth above is cause for remand. *See Snell*, 177 F.3d at 133 ("Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."); *see also Ferraris v. Heckler*, 728 F.2d 582, 586–87 (2d Cir.1984) (case remanded because ALJ failed to consider treating physician's opinion as to claimants ability to sit for more than one to two hours at a time).

Moreover, Dr. Rosenberg's conclusion that the plaintiff could stand for three hours, for thirty minutes at a time, sit for three hours, for twenty to thirty minutes at a time and lift ten pounds occasionally is in direct conflict with Dr. Gowd's conclusion that the plaintiff could lift up to ten pounds frequently and twenty pounds occasionally, stand and/or walk for about six hours a day and sit for about six hours a day in an eight hour workday. The ALJ failed to reconcile this discrepancy and failed to specify why the conclusion of Dr. Gowd was entitled to more weight than that of Dr. Rosenberg.

Furthermore, the objective diagnostic tests performed on the plaintiff revealed central herniation at L4–5 and L5–S1, an annular tear at L4–5, cervical kyphosis with reflex muscle spasm, a herniated disc at C6–7, bulging discs at C4–5 and C5–6, and bilateral C6–7 radiculopathies. These tests coupled with the fact that Dr. Ayyub, a State Agency medical consultant who examined the plaintiff, stated that the plaintiff has "moderate impairment in sitting and standing continuously for more than a few hours ... [and] in lifting more than a few pounds ..." support the conclusion that Caserto did not retain the capacity to perform his former employment.

### 2. The ALJ's Assessment of the Subjective Complaints of Pain

 In the Court's view, the Commissioner failed to properly evaluate the plain-

446

tiff's subjective complaints of pain. Here, the ALJ found that the "[plaintiff's] testimony concerning his conditions and limitations was not supported by objective clinical examination findings of an impairment ... and was inconsistent with his description of broad range of daily activities which include driving a car, going to the barber, bathing and dressing himself, making his bed, going to the bank and ATM and riding his motorcycle." However, the plaintiff's testimony at the hearing coupled with subjective complaints of pain made to his treating physicians reveal that his daily activities were extremely limited. Furthermore, the plaintiff testified that he rode his motorcycle approximately three times since he stopped working in August, 1998 until he was injured in July, 1999 for the limited purpose of maintaining the bike so that it could be sold.

Here, the ALJ concluded that although the plaintiff is impaired by chronic cervical and lumbosacral spine sprains/strains, the plaintiff failed to sustain his burden of proving that he is prevented by his impairments from performing his former light work as an automobile sales manager. However, the ALJ failed to set forth his conclusions "with sufficient specificity to enable [this Court] to decide whether [this] determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir.1984). In the Court's view, had the ALJ more seriously considered the treating physicians' opinions in more depth, he might have found that Caserto did not retain the capacity to perform his former employment.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the Commissioner's cross-motion for judgment on the pleadings is **DENIED;** and it is further

**ORDERED,** that Caserto's motion for judgment on the pleadings is **GRANTED;** and it is further

**ORDERED,** that the final decision of the Commissioner is vacated and this case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further administrative proceedings in accordance with this Order; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**